UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| ANITA S. PHILLIPS and WAYNE L. | ) | |
| PHILLIPS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The plaintiff, United States of America, by and through its counsel, complains and alleges the following:

### Introduction

1.  This civil action is brought by the United States to recover unpaid civil penalties assessed against defendants, Anita S. Phillips and Wayne L. Phillips (collectively, the "defendants" or the "Phillips"), for their willful failure to report their interests in certain foreign financial accounts timely, as required by 31 U.S.C. § 5314 and its implementing regulations (commonly referred to as an "FBAR penalty"), plus interest, failure to pay penalties and other additional amounts, such as administrative costs, that have accrued and continue to accrue, as provided by law, from the date of assessment until paid.

### Authorization for Suit

2.  The United States brings this suit under 31 U.S.C. § 3711(g)(4)(C), and in accordance with 31 U.S.C. § 5321(b)(2), at the direction of the Attorney General of the United

States and at the request of, and with the authorization of, the Internal Revenue Service ("IRS"), Office of Division Counsel, a delegate of the Secretary of Treasury of the United States.

## Jurisdiction and Venue

3.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1355(a) because it arises under a federal statute, the United States is the plaintiff, and the action seeks to recover civil penalties assessed under 31 U.S.C. § 5321(a)(5).

4.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1), (2) and 1395(a) because the defendants reside in Santa Rosa County, Florida, a substantial part of the events or omissions giving rise to the claim occurred in Santa Rosa County, and the FBAR penalties at issue accrued in Santa Rosa County.

## Parties

5.     The defendants, Anita S. Phillips ("Anita") and Wayne L. Phillips ("Wayne"), are the persons against whom the FBAR penalties at issue in this action are assessed for the calendar year 2010.  During the relevant periods, the Phillips were United States citizens and resided in Gulf Breeze, Florida.

## General Background

### A.  *The Phillips' Vitamin-Supplement Business.*

6.     In 2001, the Phillips moved to Newburgh, Indiana.  After moving to Indiana, the Phillips engaged in the business of soliciting and selling, via third-party telemarketers, vitamins, supplements, beauty products and other personal goods to consumers in Indiana and other states ("vitamin-supplement business").

7.      The Phillips conducted their vitamin-supplement business under the names of "Phillips Nutritionals, Inc.," "Institute of Natural Health," "Foxfire Corporation," "Foxfire, LLC," and "Premier Products."

8.      On January 5, 2004, the Attorney General for the State of Indiana ("Attorney General") filed a complaint against, *inter alia*, the Phillips, seeking to enjoin certain activities of their vitamin-supplement business and obtain relief for numerous aggrieved consumers on the grounds that their business activities conducted since at least February 2003 violated a number of state and federal consumer protection statutes (e.g., misrepresentations, deceptive sales and billing practices, and unauthorized billings).  See State of Indiana v. Phillips Nutritional, Inc., et al., Case No. 04-cv-00001-RLY-WGH (S.D. Ind.), at Doc. 1.  Thereafter on August 9, 2004, the complaint was amended.  See Phillips Nutritional, Case No. 04-cv-00001, at Doc. 28.

9.      In July 2004, the Phillips moved to Pensacola, Florida.

10.      On January 23, 2007, based on the parties' agreement, the district court entered a judgment against the defendants, including the Phillips, enjoining them, *inter alia,* from "conducting or otherwise participating . . . in any telemarketing campaign directed to or soliciting orders from individuals purchasing goods or services for primarily personal, family, or household purposes (hereinafter referred to as 'consumers')."  See Phillips Nutritional, Case No. 04-cv-00001, at Doc. 53.  In addition to the permanent injunction entered against the defendants, the judgment also ordered them to pay full restitution to 610 consumers, a certain sum to the Attorney General's consumer protection fund, and the costs of the Attorney General's investigation and prosecution of the subject matter of the lawsuit (the "Consumer Protection Settlement").  See Phillips Nutritional, Case No. 04-cv-00001, at Doc. 53.  See also, ¶¶ 11 and 26-27, *infra*.

11.     The defendants, by and through certain bankruptcy trustees, made the payments that were required under the Consumer Protection Settlement.  See ¶¶ 26-27, *infra*.

### B. The Bankruptcy Proceedings of Foxfire, LLC.

12.     On October 31, 2003, Foxfire, LLC ("Foxfire"), by and through its managing member, Wayne Phillips, filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code, Title 11 U.S.C.  See In re Foxfire, LLC, Case No. 03-72310-BHL (Bankr. S.D. Ind.), at Doc. 1.

13.     By Order entered on August 24, 2004, the bankruptcy court converted the Chapter 11 case to one under Chapter 7 of the U.S. Bankruptcy Code, and ordered that Foxfire cease all business activities immediately.  See Foxfire, Case No. 03-72310, at Doc. 79.

14.     On April 27, 2017, the bankruptcy court entered a final decree, and ordered the case closed.  See Foxfire, Case No. 03-72310, at Doc. 277.  See also, ¶¶ 26-27, *infra*.

### C. The Bankruptcy Proceedings of Wayne L. Phillips.

15.     On October 20, 2004, three petitioning creditors (i.e., Fifth Third Bank, the Chapter 7 Trustee for the bankruptcy estate of Foxfire ("Foxfire Trustee"), and the Town of Newburgh, Indiana) filed an involuntary petition, requesting that an order of relief be entered against the debtor, Wayne F. Phillips, under Chapter 7 of the U.S. Bankruptcy Code.  See In re Wayne F. Phillips, Case No. 04-72203-BHL (Bankr. S.D. Ind.), at Doc. 1.

16.     On November 16, 2004, Wayne moved the bankruptcy court to dismiss the case or, in the alternative, transfer the case to the United States District Court for the Northern District of Florida, claiming to have been a resident of Pensacola, Florida since July 14, 2004.  See Phillips, Case No. 04-72203, at Docs. 4 and 5.

4

17.     By Order entered on February 2, 2005, the bankruptcy court denied Wayne's motions to dismiss the case or, in the alternative, transfer the case to Florida.  See Phillips, Case No. 04-72203, at Docs. 37 and 38.

18.     On February 2, 2005, the bankruptcy court granted the petitioning creditors' motion for relief nunc pro tunc.  See Phillips, Case No. 04-72203, at Doc. 36.  Upon granting the petitioning creditors' motion, the court entered an order of relief against Wayne Phillips under Chapter 7 of the U.S. Bankruptcy Code effective January 19, 2005, and appointed a Chapter 7 Trustee ("Wayne's Trustee").  See Phillips, Case No. 04-72203, at Doc. 36.

19.     Wayne filed bankruptcy schedules in which he reported, *inter alia*, that the value of his membership interest in Woodridge, LLC ("Woodridge") equaled $11,500.  See Phillips, Case No. 04-72203, at Doc. 56.  See also, ¶¶ 33-71, *infra*.  Despite Wayne's representation to the bankruptcy court, Woodridge's books and records indicate that the company's assets totaled at least $2 million, and the value of his 50% interest in Woodridge was at least $1 million, when he filed his bankruptcy schedules.  See ¶¶ 33-44, *infra*.

20.     On his bankruptcy schedules, Wayne also stated that he was entitled to claim certain exemptions based on Florida law.  See Phillips, Case No. 04-72203, at Doc. 56.

21.     Wayne's Trustee and certain creditors objected to the exemptions that Wayne claimed under Florida law.  See Phillips, Case No. 04-72203, at Docs. 75, 82, 83 and 85.

22.     The bankruptcy court sustained the Trustee's Objection to Exemptions on the grounds that Wayne had not established that he had relinquished his Indiana domicile on or before July 21, 2004.  See Phillips, Case No. 04-72203, at Doc. 254.  The court found that as of July 21, 2004, Phillips was not physically present in Florida.  A substantial portion of his furniture and personal property remained in Indiana.  Phillips maintained a number of Indiana bank accounts and

5

continued to conduct business from his Indiana residence after July 21, 2004.  He received mail in Indiana up to and including September 2004.

23.     Wayne appealed the adverse decision of the bankruptcy court to the district court, and the district court affirmed the bankruptcy court's decision, sustaining the Trustee's Objection to Exemption.  See Phillips v. Laplante, Case No. 06-cv-123 (S.D. Ind.), *aff'g.*, Phillips, Case No. 04-72203.

24.     On December 26, 2007, the bankruptcy court entered an Order of Discharge.  See Phillips, Case No. 04-72203, at Doc. 367.

25.     On January 25, 2008, the bankruptcy court entered a Final Decree.  See Phillips, Case No. 04-72203, at Doc. 369.  The case was closed on March 11, 2008.  See Phillips, Case No. 04-72203, at Doc. 371.  See also, ¶¶ 26-27, *infra*.

### D.  The Payments Made Pursuant to the Consumer Protection Settlement.

26.     On November 10, 2005, the Indiana Attorney General agreed to refrain from filing any claims in the bankruptcy case of Wayne Phillips if the defendants, including the Phillips, agreed, *inter alia*, to pay full restitution to 610 consumers whose claims were filed and approved in the Foxfire bankruptcy, and the costs of the Attorney General's investigation and prosecution of the district court case and the bankruptcy cases of Foxfire and Wayne Phillips.  See Phillips Nutritional, Case No. 04-cv-00001, at Doc. 52.  See ¶ 10, *supra*.

27.     The bankruptcy estates of Foxfire and Wayne Phillips, by and through their respective trustees, made the following payments under the Consumer Protection Settlement:

      a.     Wayne's Trustee disbursed the sum of $59,765.22 that the estate received from the sale of the Phillips' residence located in Newburgh, Indiana;

    **b.**    Wayne's Trustee disbursed the sum of $54,314.04 that the estate

        received as a distribution from the Clerk of the Vanderburgh Superior

        Court;

    **c.**    Wayne's Trustee disbursed the sum of $463,500.00 that the estate

        received from Anita on February 15, 2007; and

    **d.**    Foxfire's Trustee disbursed the sum of $25,000 that the estate received

        from Anita on February 15, 2007.

See ¶ 10, *supra*.

### The Phillips Willfully Failed To Report Their Interests
### In Certain Foreign Financial Accounts Timely

**28.**    Section 5314 of Title 31 of the United States Code (U.S.C.) authorizes the Secretary of the Treasury to require United States citizens or residents ("U.S. persons") to file reports when they make a transaction or maintain a relationship for any person with a foreign financial agency. See 31 U.S.C. § 5314(a).

**29.**    Under the implementing regulations of the statute, 31 U.S.C. § 5314, "[e]ach United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship" to the IRS "for each year in which such relationship exists . . . [on] a reporting form prescribed under 31 U.S.C. § 5314." See 31 C.F.R. § 1010.350(a) (formerly, 31 C.F.R. § 103.24(a) (2010)).

**30.**    "Signature or other authority" generally is defined as "the authority of an individual (alone or in conjunction with another) to control the disposition of money, funds or other assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained." See 31 C.F.R. § 1010.350(f).

31.     To fulfill the reporting requirement imposed under 31 U.S.C. § 5314 for the calendar year 2010, a U.S. person who had a financial interest in, or signature or other authority over, a foreign bank, securities, or other financial account was required to report the interest to the IRS by filing a Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts," commonly known as an "FBAR," by June 30 of the year following any calendar year in which the aggregate balance of such account(s) exceeded, at any time during that calendar year, $10,000.  See 31 C.F.R. §§ 1010.306(c) and 1010.350(a) (formerly, 31 C.F.R. §§ 103.24(a) and 103.27(c)(2010)).

### The Phillips' Interests In Certain Foreign Financial Accounts

32.     During 2010, the Phillips had a financial interest in, and signature or other authority over, certain financial accounts established and maintained at LOM Securities (Cayman) Limited ("LOM") and Cedrus Investments Ltd. ("Cedrus").

#### A.  LOM Account.

33.     Before Foxfire filed for bankruptcy relief, the Phillips met with Gerald L. Larsen, Esq. ("Larsen") of Larsen & Risley in Costa Mesa, California, a specialist in offshore asset protection, to discuss various options regarding how they could protect their assets from creditors. See ¶¶ 6-27, supra.  As a result of those discussions, the Phillips chose a complex structure by which to implement their offshore asset protection arrangement.  See ¶¶ 35-71, infra.

34.     Larsen stated that he had advised the Phillips on several occasions that, although the arrangement was designed to protect their assets, the tax implications of the arrangement were to be neutral, and they must comply with the requirements of all taxing authorities, including the U.S. authorities.  Larsen stated that he did not remember discussing the requirements of Schedule B or the filing of FBARs with the Phillips, but if they had asked him, he would have told them that they must comply with those requirements.  See ¶¶ 72-94, infra.

8

35.    At the end of 2003, in furtherance of their desire to protect their assets from creditors, the Phillips arranged for and implemented the following complex structure.  On November 13, 2003, the Phillips formed Woodridge, an investment company incorporated as a limited liability company under the laws of the Island of Nevis, and entered into an Operating Agreement for Woodridge.  The beneficial owners of Woodridge as of November 13, 2003, were as follows:

| Members | Ownership Percentage |
|---|---|
| **Managing Members:** | |
| Wayne L. Phillips | 0.5% |
| Anita S. Phillips | 0.5% |
| **Non-managing Members:** | |
| Wayne L. Phillips | 49.5% |
| Anita S. Phillips | 49.5% |

36.    On December 4, 2003, Wayne executed an irrevocable durable power of attorney in favor of Anita, as a manager of Woodridge, to, *inter alia,* "sign, acknowledge, file and record all documents and to perform every act necessary, requisite and proper, in [her] sole discretion relating to [Woodridge], and its activities."  See Durable Power of Attorney executed by Wayne L. Phillips on December 4, 2003, at p. 1.

37.    On December 4, 2003, Anita executed an irrevocable durable power of attorney in favor of Wayne, as a manager of Woodridge, to, *inter alia,* "sign, acknowledge, file and record all documents and to perform every act necessary, requisite and proper, in [his] sole discretion relating to [Woodridge], and its activities."  See Durable Power of Attorney executed by Anita S. Phillips on December 4, 2003, at p. 1.

38.    On December 16, 2003, the Phillips, by and through Woodridge, established an investment account with LOM domiciled in Grand Cayman, Cayman Islands, bearing Account No. ****110 (the "LOM account").  Andrew W. Golding was the LOM Broker assigned to handle the LOM account.

39.    On December 16, 2003, Wayne, as a manager of Woodridge, executed a Corporate Resolution, advising LOM that he and Anita, as the managers of Woodridge, are authorized on behalf of Woodridge "to do all acts and things and sign all documents required to operate and deal with the [LOM] account," including, *inter alia*, the following:

(a)  To give instructions to the [LOM] Brokers either written, verbal or by telephone or telegraph, to buy or sell or otherwise deal with securities on behalf of [Woodridge] and either for immediate or future delivery and to bind [Woodridge] in respect of any transaction;

(b)  To give instructions to the [LOM] Brokers for the delivery of or to receive delivery of cash and securities from the account of [Woodridge] including instructions as to the transfer of any such securities to the name of [Woodridge], to the name of any officer or employee of [Woodridge] or to any other person or [Woodridge] whatsoever;

(c)  To make payments to the [LOM] Brokers for the credit of [Woodridge] either through transfer of [Woodridge]'s funds or in any other manner whatsoever; and to receive from the Brokers and give receipts to the Brokers for any monies from the account of [Woodridge] kept with the Brokers and to verify, certify or confirm any statements of the Brokers with respect to the said account.

See Corporate Resolution executed by Wayne L. Phillips, as Manager of Woodridge, LLC, in Newburgh, Indiana on December 16, 2003, at p. 1.

40.    The Corporate Resolution of December 16, 2003 also provided that "[the] resolution and all parts thereof shall remain in full force and effect until written notice of revocation of the resolution or any part thereof shall be delivered to the [LOM] Brokers."  See Corporate Resolution

10

executed by Wayne L. Phillips, as Manager of Woodridge, LLC, in Newburgh, Indiana on

December 16, 2003, at p. 2.

41.     When the Phillips established the LOM account, they stated that the beneficial

owners of Woodridge were as follows:

| Members | Ownership Percentage |
|---|---|
| *Managing Members:* | |
| Wayne L. Phillips | 0.5% |
| Anita S. Phillips | 0.5% |
| *Non-managing Members:* | |
| Wayne L. Phillips | 49.5% |
| Anita S. Phillips | 49.5% |

42.     When opening the LOM account, the Phillips listed their residential address as the

address for Woodridge's registered office.

43.     When the Phillips established the LOM account, they declined to receive statements

for the LOM account by mail.  They did, however, request that they be given online access to those

statements.

44.     From December 2003 through February 2004, the Phillips transferred funds of

approximately $2 million, from their domestic accounts to the LOM account.

45.     On or about December 16, 2003, the Phillips established a grantor's trust, referred to

as the "Jefferson Asset Protection Trust" ("JAP Trust"), under the laws of Cook Islands, pursuant

to the International Trusts Act of 1984, and they named FidelityCorp Limited ("FidelityCorp") to

serve as Trustee of the JAP Trust.  The Phillips named themselves as discretionary beneficiaries of

the JAP Trust.  Portcullis Trustnet (Cook Islands) Limited ("Portcullis") managed the trust for

FidelityCorp.

11

46.     After the JAP Trust was formed, the Phillips, as settlors, contributed to the trust, *inter alia*, their non-managing membership interests in Woodridge.

47.     In December 2003, the members of Woodridge amended Woodridge's Operating Agreement, to allow for the admission of the JAP Trust as a non-managing member, and the withdrawal of the Phillips as non-managing members.

48.     After the Phillips transferred their non-managing membership interests in Woodridge to the JAP trust, the beneficial owners of Woodridge at the end of December 2003, were as follows:

| Members | Ownership Percentage |
|---|---|
| *Managing Members:* | |
| Wayne L. Phillips | 0.5% |
| Anita S. Phillips | 0.5% |
| *Non-managing Members:* | |
| Jefferson Asset Protection Trust | 99.0% |

49.     In or around May 2004, Woodridge acquired real property located at 4031 Landfall Drive, Pensacola, Florida ("Landfall property").

50.     On November 17, 2004, the members of Woodridge amended Woodridge's Operating Agreement to remove Wayne, as a manager of Woodridge, and to provide for the automatic removal of a manager of Woodridge.

51.     On January 8, 2005, the members of Woodridge entered into a Third Amendment to Woodridge's Operating Agreement.  One amendment reflected the withdrawal of Anita as a manager of Woodridge, and the conversion of her member interest from managing to

12

non-managing.  The other amendment reflected that the JAP Trust would serve as the manager of Woodridge and hold a 1% managing member interest in Woodridge.

52.     After the Third Amendment to Woodridge's Operating Agreement was executed in January 2005, the beneficial ownership of Woodridge was held by the following persons in the following percentages:

| Members | Ownership Percentage |
|---|---|
| *Managing Members:* | |
| Jefferson Asset Protection Trust | 1.0% |
| *Non-managing Members:* | |
| Jefferson Asset Protection Trust | 98.0% |
| Wayne L. Phillips | 0.5% |
| Anita S. Phillips | 0.5% |

53.     By resolution dated February 14, 2006, FidelityCorp, the Trustee of the JAP Trust, with its principal place of business located at the offices of Portcullis in Rarotonga, Cook Islands, resolved to attend to all matters necessary to change the signature authority of the LOM account, to reflect that it, as Trustee of the JAP Trust, is the sole manager of Woodridge.

54.     On February 14, 2006, FidelityCorp, as Trustee of the JAP Trust and the manager of Woodridge, by and through Ronald Summers ("Summers"), executed a Corporate Resolution, advising LOM of the FidelityCorp representatives that are authorized on behalf of Woodridge "to do all acts and things and sign all documents required to operate and deal with the [LOM] account," including, *inter alia*, the specific acts identified in paragraph 39, above.  See Corporate Resolution executed by FidelityCorp Limited, by and through Ronald Summers, in Rarotonga, Cook Islands on February 14, 2006, at p. 1.

13

55.     The Corporate Resolution of February 14, 2006 also provided that "[the] resolution and all parts thereof shall remain in full force and effect until written notice of revocation of the resolution or any part thereof shall be delivered to the [LOM] Brokers." See Corporate Resolution executed by FidelityCorp Limited, by and through Ronald Summers, in Rarotonga, Cook Islands on February 14, 2006, at p. 2.

56.     On March 14, 2006, FidelityCorp, by and through Summers, executed an Account Status Confirmation for the LOM account, confirming, in pertinent part, that Woodridge, the account holder, "ha[d] total assets of not less than US$5 million or its equivalent in any other currency," that the LOM account "be designated with the status of 'high net worth/sophisticated' [investment] account," and that upon changing the status of the LOM account as requested, above, "[LOM would] not be subject to regulation by the Cayman Islands Monetary Authority with respect to . . . said account." See Account Status Confirmation executed by FidelityCorp Limited, by and through Ronnie Summers, on March 14, 2006.

57.     In June 2006, Woodridge sold the Landfall property for approximately $490,000. After the sale, the sum of $419,069.86 was deposited to the LOM account.

58.     In February and March 2007, upon the request of Anita and at the direction of Summers of Portcullis, acting on behalf of the JAP Trust, Woodridge disbursed approximately $850,000 from the LOM account, to Anita in the form of purported loans.

59.     On February 27, 2007, Anita sent an e-mail to Summers requesting a disbursement of funds from the LOM account in the amount of $425,000, stating, in pertinent part, the following:

> I am in need, again, of $425,000 USD to be wired into a US bank account
> (mine) from Lom/Andrew Golding.  As we did before, please have
> Andrew wire this amount to my account - - instructions below.  We will

> categorize it as a loan again.  We need these funds prior to March 7 (we are purchasing a home) and ***I don't believe we will be able to regain control of the trust by that date.***  I'm sorry to inconvenience you, however, ***I thought we would have regained control by this date,*** hence the scheduled closing date of March 7.

Emphasis added.

60.     After receiving Anita's e-mail dated February 27, 2007, identified in paragraph 59, above, Summers forwarded it to Marie Francis of Portcullis, stating, in pertinent part, the following:

> One of the Settlors of the Jefferson Asset Protection Trust wants to borrow USD 425,000 from the Trust's underlying LLC.  We control the account of the underlying LLC.  Before I left I completed a loan of around the same amount to Anita Phillips.  This will be another loan from the LLC to Anita Phillips.
>
> . . . .
>
> I have spoken to the lawyers of the client and asked them to ***please talk to the client about the "control" references she uses in respect of the Trust***. . . .

Emphasis added.

61.     By facsimile dated March 14, 2007, FidelityCorp, as Trustee of JAP Trust, advised LOM that the signatories of the LOM account had been changed effective March 13, 2007, to reflect that the JAP Trust had withdrawn as the sole manager of Woodridge, and that Wayne and Anita had been elected to serve as the managers of Woodridge.  FidelityCorp also advised that the beneficial ownership of Woodridge as of March 13, 2007, was as follows:

| Members | Ownership Percentage |
| --- | --- |
| ***Managing Members:*** | |
| Wayne L. Phillips | 0.5% |
| Anita S. Phillips | 0.5% |

15

| Members | Ownership Percentage |
| --- | --- |

*Non-managing Members:*

Jefferson Asset Protection Trust      99.0%

62.    On April 12, 2007, the Phillips, as managers of Woodridge, executed a Corporate Resolution, advising LOM that the Phillips, as the managers of Woodridge, are authorized on behalf of Woodridge "to do all acts and things and sign all documents required to operate and deal with the [LOM] account," including, *inter alia*, the specific acts identified in paragraph 39, above. See Corporate Resolution executed by Anita S. Phillips and Wayne L. Phillips, as Managers of Woodridge, LLC, in Pensacola, Florida on April 12, 2007, at p. 1.

63.    The Corporate Resolution of April 12, 2007 also provided that "[the] resolution and all parts thereof shall remain in full force and effect until written notice of revocation of the resolution or any part thereof shall be delivered to the [LOM] Brokers." See Corporate Resolution executed by Anita S. Phillips and Wayne L. Phillips, as Managers of Woodridge, LLC, in Pensacola, Florida on April 12, 2007, at p. 2.

64.    The LOM account had the following balances in U.S. dollars on the following dates:

| Date | Balance (U.S. Dollars) |
| --- | --- |
| January 31, 2010 | $ 3,294,293.89 |
| February 28, 2010 | $ 3,292,648.20 |
| March 31, 2010 | $ 3,293,748.39 |

65.    By facsimile on April 12, 2010, the Phillips, as managing members of Woodridge, instructed LOM, in pertinent part, as follows:

> Our attorney has advised us to close [the LOM] account immediately, due to [LOM's] relocation from the Caym[a]n[ Islands].  Please sell all fixed asset accounts and contact Cedrus Investments Ltd., 802 West Bay Rd, Caym[a]n Islands, K11205. . . .  Someone will be contacting you from Cedrus to arrange transfer.

16

66.     The April 12th facsimile contains a handwritten note that states "Sold mmkt, fixed income 4/13/10."

67.     By facsimile dated April 20, 2010, the Phillips instructed LOM, in pertinent part, as follows:

> Please convert the Canadian Dollars into US Dollars + make one wire for
> Cedrus on Thursday or Friday.

68.     On April 27, 2010, based on the authorized signatory of Wayne on April 23, 2010, LOM transferred funds, totaling $3,302,694.24, from the LOM account to the account that the Phillips, by and through Woodridge, established and maintained at Cedrus Investments Ltd. ("Cedrus"), bearing Account No. *********601 ("Cedrus account").  See ¶¶ 70 and 71, *infra*.

69.     The LOM account was closed on May 6, 2010, and LOM ceased its operations in the Cayman Islands on July 2010.

**B. *Cedrus Account.***

70.     On April 28, 2010, Cedrus confirmed receipt of the cash sum of $3,302,694.24 that was transferred from the LOM account, and deposited into the Cedrus account.  See ¶ 68, *supra*.

71.     The Cedrus account had the following balances in U.S. dollars on the following dates:

| Date | Balance (U.S. Dollars) |
|------|------------------------|
| April 28, 2010 | $ 3,302,694.24 |
| December 31, 2010 | $ 3,394,928.48 |
| December 31, 2011 | $ 2,904,533.19 |
| December 31, 2012 | $ 3,237,846.24 |

**The Phillips Did Not File A Timely FBAR for 2010**

72.    The aggregate amount of the balances of the Phillips' foreign financial accounts (i.e., LOM account and Cedrus account) exceeded $10,000 during the calendar year 2010.  See ¶¶ 68 and 71, *supra*.

73.    As a consequence, the Phillips were required to file a timely FBAR, reporting their financial interests in, and signature or other authority over, the foreign financial accounts (i.e., LOM account and Cedrus account) for the calendar year 2010.

74.    The Phillips did not file a timely FBAR for the calendar year 2010.  Indeed, they did not file any FBARs until the IRS notified them, by letters dated January 15, 2016, that it was commencing an FBAR examination for the calendar years 2010 through 2012.  After such notification, the Phillips filed delinquent FBARs for 2010 through 2013 on April 2, 2016.  The Phillips stated that the reason why they failed to file the FBARs timely was because they "[d]id not know that [they] had to file."

75.    Although the Phillips reported the Cedrus account on their delinquent FBAR filed for 2010, they did not report the LOM account.

76.    On their delinquent FBARs, the Phillips reported that the maximum account values of the Cedrus account were $3,305,357, $3,242,776, $3,144,479 and $3,470,392 for 2010, 2011, 2012 and 2013, respectively.

77.    Although the Phillips were required to file FBARs to report their interests in the LOM account for the calendar years 2003 through 2009, they did not do so.  The limitation periods for assessing FBAR penalties for those years have expired.

**The Phillips Did Not Disclose Their Interests**
**In Certain Foreign Financial Accounts on Their Income Tax Returns**

**78.**　　The Phillips filed joint federal income tax returns ("Forms 1040") for 2003 through 2013.

### A. Tax Preparers Prepared the Phillips' Returns.

**79.**　　The Phillips hired two tax preparers to prepare their income tax returns during the relevant periods.  Specifically, the Phillips retained Robert Zeller of Robert Zeller CPA, Inc. located in Bowling Green, Kentucky, to prepare their income tax returns for 2003 through 2007.  They retained Scott Sandfort ("Sandfort") of Bass & Sandfort Accountants, PA located in Pensacola, Florida, to prepare their income tax returns for 2008 through 2013.

**80.**　　In addition to preparing the Phillips' Form 1040 for 2010, Sandfort also prepared the following returns for that year:

　　　　**a.**　Form 1065, "U.S. Return of Partnership Income," filed by Woodridge, LLC;

　　　　**b.**　Form 3520, "Annual Return to Report Transactions with Foreign Trusts," filed by the Phillips; and

　　　　**c.**　Form 3520-A, "Annual Information Return of Foreign Trust with a U.S. Owner," filed by Jefferson Asset Protection Trust.

**81.**　　When the Phillips sought to retain Sandfort as their tax preparer for their 2008 filings, Sandfort advised them that he had little, if any, experience with the filing requirements for, and the taxation of, foreign investments.  He explained that he currently had no clients with any foreign investments, and that he had only one client in the past.  He advised the Phillips that he would rely heavily on their prior filings to prepare their filings for 2008.

19

82.    Sandfort did not use organizers to gather the information necessary to prepare his clients' tax returns.  Rather, he requested that his clients provide him with the documentation necessary to prepare their returns.

83.    The Phillips did not disclose to their preparers that they had a "signature or other authority" over the LOM account and/or the Cedrus account.  This nondisclosure precluded the preparers from preparing accurate income tax returns and timely FBARs.  See ¶¶ 72-77, *supra*, and ¶¶ 84-93, *infra*.

**B.  The Phillips Failed To Report Their Income from Foreign Investments Timely.**

84.    The Phillips failed to report any income from their foreign investments, including the LOM account, on their joint federal income tax returns (Forms 1040) filed for 2003, 2004, 2005, 2006 and 2007.

85.    In June 2008, after the district court approved the Consumer Protection Settlement in January 2007, the Phillips amended their Forms 1040 for 2005, 2006 and 2007 to report the earnings that they received from their foreign investments in the amounts of $139,082, $25,909, and $545,739, respectively.  No FBARs were filed at that time.  See ¶¶ 72-77, *supra*.

86.    The Phillips claim that they did not amend their 2003 and 2004 returns because they did not have any "specific evidence" that any income was omitted from those returns.  They further claim that even if they did fail to report any earnings from their foreign investments for 2003 and 2004, the limitation periods for assessing taxes for those years had expired by June 2008.

87.    Although the Phillips amended their return for 2006 to include income from their foreign investments, they failed to report the gain on the sale of the Landfall property that Woodridge sold in June 2006.  See ¶¶ 49 and 57, *supra*.  The gain on the sale was approximately

$240,000.  As a consequence, the IRS has proposed to increase the Phillips' income tax liability for 2006 to reflect the tax due on the gain from the sale.  See ¶ 89, *infra*.

88.     Although the Phillips had instructed LOM to sell their securities in the LOM account, convert all monies into U.S. dollars, and then transfer the funds to the Cedrus account in 2010, they told Sandfort that LOM had transferred the securities intact to Cedrus.  Sandfort understood this to mean that the securities were transferred in kind, and therefore, there was no taxable event.  As a consequence, the Phillips did not report any gains from the sales of the securities on their 2010 return.  The gains realized from those sales totaled approximately $201,000.  In view of the above, the IRS proposed to increase the Phillips' income tax liability for 2010 to reflect the tax due on the gains realized from the sales of the securities.  See ¶ 89, *infra*.

89.     During the IRS's examination of the Phillips' joint income tax returns, the IRS determined that the couple had failed to report substantial amounts of income for 2006, 2007, 2010 and 2012.  As a consequence, the IRS proposed, *inter alia*, adjustments to the couple's income in the amounts of $248,046, $922,049, $207,811 and $2,783 for 2006, 2007, 2010 and 2012, respectively.  Based on the proposed adjustments, above, the IRS proposed tax deficiencies in the amounts of $11,715, $205,501, $45,077 and $6,561 for 2006, 2007, 2010 and 2012, respectively.[1]

**C.  *The Schedule B Did Not Disclose the Phillips' Interests In Certain Foreign Financial Accounts.***

90.     The Schedule B filed with the Forms 1040 for 2003 through 2013 include the following two questions:

> *Question 7a:*  At any time during [the relevant calendar year], did you
> have an interest in or a signature or other authority over a financial

---

[1]   The Phillips have filed a petition with the United States Tax Court, seeking a redetermination of the proposed tax deficiencies, including penalties and interest, for 2006, 2007, 2010 and 2012.  See Phillips v. Commissioner, Docket No. 7397-19.

account in a foreign country, such as a bank account, securities account, or other financial account?

*Question 8:*    During [the relevant calendar year], did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?

91.    Despite the Phillips having interests in foreign financial accounts, being grantors of, or transferors to, a foreign trust, and/or having received over $1,500 of taxable interest or ordinary dividends during each of the relevant periods, they did not respond to the Schedule B questions, or they provided inaccurate or incomplete responses to the questions.  The chart, below, summarizes the Phillips' responses to the Schedule B questions for the calendar years 2005 through 2013:

| Year | Date Filed | Form 1040 or Form 1040X | Response to Schedule B Questions |
|------|------------|-------------------------|----------------------------------|
| 2005 | Not Available | Form 1040 | Responded "NO" to Questions 7a & 8 |
| 2005 | 6/16/08 | Form 1040X | Responded "NO" to Questions 7a & 8 |
| 2006 | Not Available | Form 1040 | Not Available |
| 2006 | 6/16/08 | Form 1040X | Responded "NO" to Questions 7a & 8 |
| 2007 | Not Available | Form 1040 | Responded "NO" to Questions 7a & 8 |
| 2007 | 6/16/08 | Form 1040X | No Schedule B Included |
| 2008 | Not Available | Form 1040 | Did Not Respond to Questions 7a & 8 |
| 2009 | Not Available | Form 1040 | Did Not Respond to Questions 7a & 8 |
| 2010 | Not Available | Form 1040 | Responded "NO" to Questions 7a & 8 |
| 2011 | Not Available | Form 1040 | Did Not Respond to Questions 7a & 8 |
| 2012 | Not Available | Form 1040 | Responded "NO" to Questions 7a, but "YES" to Question 8 |
| 2013 | Not Available | Form 1040 | Did Not Respond to Questions 7a & 8 |

92.    The Schedule B also directed the Phillips to consult the instructions for Form TD F 90.22-1 in order that they could determine if the FBAR filing requirements applied to them for 2003 through 2013.

### D.  The Phillips Did Not Maintain Adequate Records.

93.    Not only did the Phillips fail to provide critical information to their tax preparers to ensure the preparation and filing of accurate returns and timely FBARs, they also failed to maintain the records that were required to be maintained under Titles 31 and 26 of the United States Code to

substantiate, *inter alia*, the balances of the foreign financial accounts, the transfers to and from said accounts, and the basis of the securities and other assets held in such accounts.

94.    For the reasons described in paragraphs 6 through 93, above, the Phillips knew that they had a legal duty to file a timely FBAR for 2010 that reported their interests in all foreign financial accounts for the calendar year 2010, and despite having that knowledge, they willfully failed to file a FBAR for 2010 by its prescribed filing date of June 30, 2011.

### Claim for Relief

95.    Section 5321(a)(5) of Title 31 U.S.C. provides for the imposition of civil penalties on any person who fails to comply with the FBAR reporting requirements under 31 U.S.C. § 5314.

96.    In the case of any person who willfully violates the FBAR reporting requirements, *inter alia*, by failing to file a timely FBAR report, disclosing the existence of a foreign financial account or any other identifying information required to be disclosed with regard to said account, the maximum amount of the penalty that may be assessed for such violation is the greater of: *(i)* $100,000; or *(ii)* 50% of the balance in the account at the time of the violation.  See 31 U.S.C. § 5321(a)(5)(C), (D).

### A. *FBAR Examination.*

97.    From the records that the IRS obtained during the FBAR examination, including but not limited to records obtained pursuant to income tax treaties or tax information exchange agreements, the IRS determined that the aggregate amount of the highest balances of the Phillips' foreign financial accounts (sometimes referred to herein as the "FF Accounts") during the calendar

year 2010, is as follows:

| Account | Highest Balances of Phillips' FF Accounts |
|---|---|
| LOM account    (Per LOM Statement) | $   3,302,694 |
| Cedrus account  (Per Cedrus Statement) | 3,394,928 |
| | $   6,697,622 |
| Less:  LOM account[2] | 3,302,694 |
| *Total for Calendar Year 2010* | ***$   3,394,928*** |

98.     The value of the LOM account as of June 30, 2011 (i.e., the date on which the

FBAR was due to be filed for the calendar year 2010) was zero.

99.     The value of the Cedrus account as of June 30, 2011, as calculated by the Phillips'

accountant, Raymond A. Moore, Jr., CPA ("Moore"), during the FBAR examination, totaled

$2,864,086.80.

100.     Based on the balances of the Phillips' FF Accounts as of the FBAR filing date for

2010, as identified in paragraphs 98 and 99, above, the maximum penalty amount that the IRS may

assess against the Phillips for willfully failing to file FBARs timely for the calendar year 2010, is

computed as follows:

| Account | Maximum Amount of FBAR Penalty for 2010 |
|---|---|
| LOM account | $      100,000 |
| Cedrus account | 1,432,044 |
| *Total Maximum Amount of FBAR Penalty for 2010* | ***$   1,532,044*** |

[2]   Because the Phillips closed the LOM account and directed LOM to transfer all of the account's assets to the Cedrus account in 2010, the aggregate amount of the highest balances of the Phillips' FF Accounts for 2010 is decreased by the balance of the LOM account to avoid counting the funds twice.

24

**101.**    Although the statute establishes the maximum penalty amount that may be assessed against a person for willfully violating the FBAR reporting requirements, it also grants the IRS the discretion to reduce the penalty if the circumstances warrant such a reduction.  See 31 U.S.C. § 5321(a)(5).

**102.**    Here, the IRS exercised its discretion and limited the FBAR penalty assessed against the Phillips for 2010, to 50% of the balance of the Cedrus account as of June 30, 2011 (i.e., $1,432,044).  Accordingly, the IRS, in its discretion, reduced the FBAR penalty from $1,532,044 to $1,432,044, to avoid double counting the funds that were transferred from the LOM account to the Cedrus account in 2010.

**103.**    Next, the IRS determined that Anita and Wayne are co-owners of the Cedrus account.  As a consequence, any penalty determination must be made separately against them in accordance with their respective co-ownership percentage of the highest balance of the Cedrus account in 2010.  Because Anita owns 50% of the highest balance of the Cedrus account in 2010, and Wayne owns the other 50%, the IRS determined that the FBAR penalty of $1,432,044 should be allocated among them equally and assessed against them in the following amounts:

| Co-owners | FBAR Penalty Assessment for 2010 (Excluding Accruals) |
|---|---|
| Anita S. Phillips | $    716,022 |
| Wayne L. Phillips | 716,022 |
| ***Total FBAR Penalty Assessment for 2010 (Excluding Accruals)*** | ***$   1,432,044*** |

See ¶¶ 33-71, *supra*.

104.     By letter dated May 25, 2017, the IRS advised Anita S. Phillips of its intent to assess an FBAR penalty against her under 31 U.S.C. § 5321(a)(5) for willfully failing to meet the filing requirements of 31 U.S.C. § 5314 for 2010, and that the proposed assessment equals $716,022, excluding accruals.

105.     By letter dated May 25, 2017, the IRS advised Wayne L. Phillips of its intent to assess an FBAR penalty against him under 31 U.S.C. § 5321(a)(5) for willfully failing to meet the filing requirements of 31 U.S.C. § 5314 for 2010, and that the proposed assessment equals $716,022, excluding accruals.

106.     By letters dated June 26, 2017, the Phillips, by and through Moore, requested a conference with IRS Appeals to protest the FBAR penalties that the IRS proposed to assess against them for 2010.

107.     Because Anita had willfully failed to file an FBAR timely for 2010, disclosing her interest in all foreign financial accounts during that calendar year, a delegate of the Secretary of the Treasury, on October 3, 2017, timely assessed a civil penalty of $716,022 against her under 31 U.S.C. § 5321(a)(5), plus accruals thereon.

108.     Because Wayne had willfully failed to file an FBAR timely for 2010, disclosing his interest in all foreign financial accounts during that calendar year, a delegate of the Secretary of the Treasury, on October 3, 2017, timely assessed a civil penalty of $716,022 against him under 31 U.S.C. § 5321(a)(5), plus accruals thereon.

109.     By letters dated February 28, 2019, after an appeals conference was held, IRS Appeals advised the Phillips, by and through their representatives, that it sustained the IRS's determination to assess the FBAR penalties against them for 2010.

**B.  *Anita Phillip's Unpaid FBAR Penalty Assessment.***

110.    By letter dated October 4, 2017, before an appeals conference was held, a delegate

of the Secretary of the Treasury gave notice of the FBAR penalty assessment described in

paragraph 107, above, to Anita S. Phillips and made demand for its payment.  The notice was sent

to her, via certified mail, to her residence located in Gulf Breeze, Florida.

111.    Although notice of the assessment has been given, IRS Appeals has sustained the

assessment, and demand for payment of the assessment has been made, Anita has failed and

refused to pay the unpaid balance of the FBAR penalty assessed against her for 2010, including

accruals thereon.  As a result of the above, the failure to pay penalty was assessed, and that penalty

and interest have accrued since October 3, 2017.

112.    As of March 19, 2019, there is due and owing from Anita, after application of any

credits and payments, the sum of $789,075.87 for the unpaid balance of the civil penalty assessed

against her under 31 U.S.C. § 5321(a)(5), including interest and failure to pay penalties under

31 U.S.C. § 3717, for the calendar year 2010, plus interest, failure to pay penalties and other

additional amounts, such as administrative costs, that have accrued and continue to accrue, as

provided by law, from March 19, 2019 to the date of payment.

113.    The United States is entitled to entry of a judgment against Anita S. Phillips in the

amount of $789,075.87, plus interest, failure to pay penalties and other additional amounts, such as

administrative costs, that have accrued and continue to accrue, as provided by law, from March 19,

2019, until paid.

**C.  *Wayne Phillip's Unpaid FBAR Penalty Assessment.***

114.    By letter dated October 4, 2017, before an appeals conference was held, a delegate

of the Secretary of the Treasury gave notice of the FBAR penalty assessment described in

paragraph 108, above, to Wayne L. Phillips and made demand for its payment.  The notice was

sent to him, via certified mail, to his residence located in Gulf Breeze, Florida.

115.    Although notice of the assessment has been given, IRS Appeals has sustained the

assessment, and demand for payment of the assessment has been made, Wayne has failed and

refused to pay the unpaid balance of the FBAR penalty assessed against him for 2010, including

accruals thereon.  As a result of the above, the failure to pay penalty was assessed, and that penalty

and interest have accrued since October 3, 2017.

116.    As of March 21, 2019, there is due and owing from Wayne, after application of any

credits and payments, the sum of $789,350.50 for the unpaid balance of the civil penalty assessed

against him under 31 U.S.C. § 5321(a)(5), including interest and failure to pay penalties under

31 U.S.C. § 3717, for the calendar year 2010, plus interest, failure to pay penalties and other

additional amounts, such as administrative costs, that have accrued and continue to accrue, as

provided by law, from March 21, 2019 to the date of payment.

117.    The United States is entitled to entry of a judgment against Wayne L. Phillips in the

amount of $789,350.50, plus interest, failure to pay penalties and other additional amounts, such as

administrative costs, that have accrued and continue to accrue, as provided by law, from March 21,

2019, until paid.

WHEREFORE, the plaintiff, United States of America, requests the following relief:

a.    That this Court enter judgment in favor of the United States of America, and against

Anita S. Phillips, in the amount of $789,075.87 for the civil penalty assessed against her under

31 U.S.C. § 5321(a)(5), including the accrual of interest and failure to pay penalties under

31 U.S.C. § 3717, for the calendar year 2010, plus interest, failure to pay penalties and other

28

additional amounts, such as administrative costs, that have accrued and continue to accrue, as provided by law, from March 19, 2019, until the judgment is paid.

      **b.**    That this Court enter judgment in favor of the United States of America, and against Wayne L. Phillips, in the amount of $789,350.50 for the civil penalty assessed against him under 31 U.S.C. § 5321(a)(5), including the accrual of interest and failure to pay penalties under 31 U.S.C. § 3717, for the calendar year 2010, plus interest, failure to pay penalties and other additional amounts, such as administrative costs, that have accrued and continue to accrue, as provided by law, from March 21, 2019, until the judgment is paid.

      **c.**    That this Court award the United States its costs in this action, and such other and further relief as justice requires.

      Respectfully submitted this 2nd day of October, 2019.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

/s/ Lynne M. Murphy
LYNNE M. MURPHY
Trial Attorney, Tax Division
U.S. Department of Justice
La. Bar No. 20465
D.C. Bar No. 485928
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 514-5881
Facsimile:   (202) 514-9868
E-mail:      lynne.m.murphy@usdoj.gov

OF COUNSEL:

LAWRENCE KEEFE
United States Attorney

The defendants' address is, as follows:

*Anita S. Phillips and Wayne L. Phillips*
1261 Greenview Lane
Gulf Breeze, Florida  32563

*The complaint will be served on the defendants, via certified mail or federal express.*